**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RODRICK BRAYBOY** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | **NO.  17-4371** |
| **ZAKIA JOHNSON, et al.** | : | |
| | : | |
| **Defendants.** | : | |

**M. Goldberg, J.**                                                      **November 16, 2018**

**<u>MEMORANDUM</u>**

Plaintiff Rodrick Brayboy, acting *pro se*, has alleged constitutional violations against fifteen Defendants.  Plaintiff's claims are premised on a variety of incidents, including allegedly being followed by police and receiving improper treatment at the hands of staff at various penal and rehabilitation institutions.  All of the named Defendants have filed Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Upon consideration of these Motions and Plaintiff's responses, I will dismiss the claims brought in Plaintiff's Third Amended Complaint in their entirety.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

A.      **<u>Facts Alleged in the Third Amended Complaint</u>**[1]

The Third Amended Complaint is somewhat difficult to decipher.  Reading the Third Amended Complaint in the light most favorable to Plaintiff, I find the facts alleged therein are as follows:

---

[1]   In deciding a motion under Federal Rule of Civil Procedure, the court must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief.  <u>Atiyeh v. Nat'l Fire Ins. Co. of Hartford</u>, 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010).

- In June 2016, Plaintiff resided in a halfway house known as the Kintock Facility. Plaintiff filed a grievance against his case manager Knight and his supervisor Cephas for informing staff and inmates at Kintock about his juvenile conviction for indecent assault. Plaintiff alleges that Cephas and Knight manipulated his social passes and program passes so he could not leave the building. (Third Am. Compl. ¶¶ 1–2.) [2]

- On June 17, 2016, Plaintiff talked to Assistant Director Guyon and Director Davis from the Kintock Facility to inform them of the problems he was having with Knight and Cephas. He also filed grievances on August 26, September 6, and October 16, 2016. (Id. ¶¶ 4–5.)

- Around early November 2016, Plaintiff contacted Zakia Johnson from the Department of Corrections and explained to her that he was being targeted at the Kintock Facility because of his juvenile conviction. In a follow-up conversation, Johnson advised that she talked to Director Davis who denied that any such events were occurring. Plaintiff continued to have problems and file grievances. (Id. ¶¶ 6, 8–9.)

- At the end of November 2016, Plaintiff returned from work and was told he was moving to CEC Broad Street. When he arrived at CEC Broad Street, Plaintiff was immediately targeted by Director Garcia who removed his new sheets from his bed for no reason and replaced them with old ones. (Id. ¶¶ 10–11.)

- On the second day after his arrival at CEC Broad Street, Plaintiff attended an orientation with his counselor Rhenae Patterson. During that orientation, Patterson made a joke about oral sex pertaining to Plaintiff's indecent assault conviction. Beginning in December 2016, Plaintiff had additional problems with Patterson, who would not put in Plaintiff's work passes. Patterson also told Plaintiff that when he went on passes, he had to return to the facility by 7:00 p.m., when she actually submitted his return time, so as to subject him to potential disciplinary action for lateness. (Id. ¶¶ 12–13.)

- In October 2016, Plaintiff started working with a staffing agency, which found him employment with Area Recycling in the Port Richmond section of Philadelphia. The employment office at Kintock contacted the staffing agency to make them aware of Plaintiff's juvenile conviction. (Id. ¶ 15.)

- In the middle of December 2016, after leaving work at Area Recycling, Plaintiff boarded a bus on Richmond Street. About four blocks into the ride, Plaintiff noticed the female bus driver looking at him in the rearview mirror with a "grimaced" look. When Plaintiff began walking towards the front of the bus to get off at the next stop, the bus driver jammed on the brakes to make him stumble. Right after that incident, Plaintiff started seeing officers

---

[2] The Third Amended Complaint has three sets of numbered paragraphs setting forth factual and legal allegations against the various Defendants. For clarity, the first set of allegations will simply be referred to as the "Third Am. Compl.," the second set of allegations will be referred to as the "Third Am. Compl., 1st Supp." and the third set of allegations will be defined as the "Third Am. Compl., 2nd Supp."

posted on Richmond Street. Plaintiff alleges that the bus driver reported to the police suspicious behavior by Plaintiff. Shortly after that, Area Recycling laid him off, claiming that work was slow. (Id. ¶¶ 16–23.)

- In January 2017, Plaintiff was searching for a room to rent so he could submit a home plan. He found an ad in the paper and talked to the property owner, who asked Plaintiff to come see the room. Plaintiff returned to CEC Broad Street and provided Patterson with the phone number and address. When Plaintiff later called the property owner, the owner stated that he had heard from Patterson and that the room would not work out because of the serious charges on Plaintiff's record. (Id. ¶ 14.)

- On January 11, 2017, Plaintiff was moved to Kalman Hall, which is considered a high-security facility, for "construction reasons." When he returned from a job search pass on January 15, 2017, he was informed by the staff at Kalman Hall that he had to be strip searched. Plaintiff subsequently endured similar searches on January 16 and January 17, 2017. Plaintiff complained to Defendant Johnson, who indicated that all thirteen inmates that were moved to Kalman Hall were subjected to the strip searches. When all of the inmates returned back to CEC Broad in February 2017, they were again strip searched. (Id. ¶¶ 25–27, 29–31.)

- In February 2017, Plaintiff started taking furloughs every week up until September 27, 2017. During this time, he would see the Upper Darby Police trail him as soon as he left his mother's house with his phone, but would not see them if he left his phone in the house. Plaintiff also started noticing strange behavior from the owners of the stores he frequented. At one store, the owner, who had known him since 2008, looked frightened. When he talked to her later, she told him police informed her that he had committed a crime. According to Plaintiff, Upper Darby police officers, under the authority of Chief Michael Chitwood, tracked his phone and told neighbors and stores about his indecent assault conviction. (Id. ¶ 32.)

- On April 21, 2017, Plaintiff filed a grievance with Defendant Richard Driesbach against Defendant Johnson, for allowing unreasonable strip searches and permitting staff to sabotage his employment and home plans. Although Plaintiff also complained to Johnson about Ms. Patterson, Johnson did not return his calls. (Id. ¶ 33.)

- On May 25, 2017, Plaintiff filed another grievance with Defendant Driesbach for not receiving a response on his prior grievance. Driesbach called and said that Defendant Johnson was looking into the problem. At that point, Plaintiff knew that Driesbach had never read the grievance, otherwise he would have known the grievance was against Ms. Johnson. Plaintiff received a response to his grievance from Johnson on June 15, 2017. (Id. ¶¶ 34–35, 37.)

- On June 21, 2017, Plaintiff filed another grievance against Johnson for (a) investigating a grievance she was directly involved in, (b) manipulating the grievance process, and (c) holding the grievance for two months. On July 20, 2017, Plaintiff wrote Driesbach to request a response on this grievance, but Plaintiff never received one. (Id. ¶¶ 38–40.)

- Plaintiff started having problems with his Board of Probation and Parole Agent Siliani in April 2017, when she did not respond to his request to obtain a furlough. Siliani also contacted All Staffing Warehouse, which is the company from which Plaintiff got his forklift certification. The company guaranteed Plaintiff a job after release conditioned on permission from Siliani. After going to All Staffing Warehouse to find out the location of his job site, Plaintiff returned to CEC Broad and provided his counselor, Ms. Patterson, with his work pass. The next day, Plaintiff called All Staffing Warehouse, but was told there was no longer a job for him. Plaintiff alleges that Siliani, Patterson, and Johnson all conspired to sabotage his employment and his reentry back into society. Plaintiff further claims that Siliani and Patterson were in constant contact with JQ Staffing, from whom Plaintiff received jobs, to sabotage any employment he may receive. (Id. ¶¶ 41–44.)

- In June 2017, CEC Broad was being closed down and Plaintiff was told he was to be moved to another center. During that time, the residents were told to find a home plan because of overcrowding. On June 14, 2017, Plaintiff was informed about a program in a recovery house called Houses of Healing. He spoke with the directors of this program, who accepted him and gave him the house address where he would be staying. He returned to CEC Broad and submitted a home plan to his new counselor, who emailed his home plan over to Siliani. (Id. ¶¶ 45–46)

- On June 14, 2017, Plaintiff contacted Deputy Pullis of Probation and Parole, described the problems he was having with Siliani, and expressed his fear that Siliani would tamper with his recent home plan. Pullis informed him that Siliani would not be the one doing the home plans. On June 16, 2017, Ms. Pierson, Siliani's supervisor, told Plaintiff that his home plan was assigned to a new agent. Four days later, Plaintiff reached out to the Houses of Healing Program and was told that a "lady agent" came out to the property and left a card because staff at the house was not available. Plaintiff then called the Parole Office on June 23, 2017 and spoke to Ms. Pierson, who informed him that the home plan was denied because nobody at the house answered the phone. Plaintiff contacted Houses of Healing staff on June 26, 2017, and they indicated that Siliani had told them about Plaintiff's past juvenile record. (Id. ¶¶ 47–52.)

- On July 9, 2017, Plaintiff filed a grievance against Siliani and Pullis for sabotaging his home plan. After waiting more than fifteen days for a response, he called Probation and Parole and was told that Pullis had retired and that there was a new deputy named Deputy Lakeisha Cooper. Plaintiff wrote to Cooper on July 30, 2017, informing her of the problems with Agent Siliani, but received no response. (Id. ¶¶ 53–54.)

- On September 25, 2017, Plaintiff submitted two passes to his new counselor, Pat Crosson, in order to research and file his claims in federal court. On the day Plaintiff filed his federal complaint, Siliani took away his furloughs on the ground that Plaintiff was not putting in home plans, even though she knew he had recently put in a home plan that was not approved. Plaintiff believes that Cooper assisted Siliani to deprive him of his furloughs. He also alleges that Johnson and Driesbach assisted in this sabotage. (Id. ¶¶ 55, 57, 58.)

- In July 2017, while at the Self Help Facility, Plaintiff started working for an agency called People Ready. Through People Ready, Plaintiff began employment at Waste Management. While there, the female staff was "kinda stand offish" and his supervisor treated him poorly. Plaintiff quit because he was overworked. (Id. ¶¶ 56, 59.)

- Plaintiff lost other jobs when Crosson and Siliani informed job supervisors of his juvenile history. For example, Plaintiff worked for a company called Regular Logistics. On one occasion, Plaintiff was scheduled to work until 5:30 p.m., but was told he could leave early because he was not feeling well. At 4:00, he received a call that Siliani had shown up to see him. Since that day, the company did not call him for work. (Id. ¶¶ 59–60.)

- On December 18, 2017, as Plaintiff was leaving the Facility, he observed two officers in the front entrance parking lot. When he returned, he observed strange behavior from staff and inmates and was getting frustrated looks. Shortly thereafter, during Christmas week, he was in his room when another inmate screamed out "He's in there watching pornography on his phone." (Third Am. Compl., 1st Supplement ("Supp") ¶ 1–3.)

- On December 18, 2017, Plaintiff was told that he was being followed by several police districts. Plaintiff believes that there must have been a meeting with officers and Director Cooper and staff about the contents on his phone. Director Cooper and staff at the Self Help Movement started telling inmates about these various events "hoping that harm comes to me or in other words provoke the harm." (Id. ¶¶ 5–6.)

- Plaintiff alleges that police have used a stingray to track his location, observe his phone content, and listen to his phone conversations. He believes they can sabotage any job he is trying to pursue. Plaintiff contends that Police Districts 7th, 8th, 15th, along with Director Cooper, Counselor Crosson, and Self-Help Movement staff are conspiring to harm him in some way. (Id. ¶¶ 7–8.)

- Plaintiff submitted a home plan for his mother's house and requested a furlough pass. On December 27, 2017, Plaintiff spoke with Ms. Braswell, from the Board of Probation and Parole, asking why he was not allowed a furlough. Ms. Braswell explained that if Plaintiff put in a home plan to his mother's address, then he could receive his furloughs again. Plaintiff contacted Johnson about the problems he was having with his furloughs and Johnson promised to have someone look into it, but no one has responded to date. (Id. ¶¶ 9–10, 12.)

- Plaintiff asserts that he is currently being targeted by the Self Help Movement staff. They have purportedly gone into his room on several occasions between 3:00 p.m. and 10:00 p.m. to look through his legal documents while he was not there. (Id. ¶ 13.)

- On February 3, 2018, Plaintiff claims he was written up by staff at the Self Help Movement Facility for a failed breathalyzer test. Braswell came to the facility the following week and Plaintiff went to see her. As he approached the office, Braswell was in a huddle talking to staff members Defendants Ryan Hinkle, Nick Laskow, and Joe McClain. Plaintiff asked

Braswell if she was there to see him regarding the write up. Braswell said "she would let me know and continued to talk with the staff." Plaintiff waited for a while and asked Braswell if she wanted to speak to him, to which she replied "no" and left. (Third Am. Compl. 2nd Supp. ¶¶ 1, 3–7.)

- On February 21, 2018, Plaintiff's parole agent, Chapman, came to the facility for his monthly visit and asked Plaintiff the usual questions. Thereafter, on March 14, 2018, Plaintiff received a visit from Chapman and a new agent, Heather Bernard. Chapman informed Plaintiff that Bernard would be his new agent and also said that he wanted to address Plaintiff's write-up. Via phone, Braswell confirmed that she had already talked to Plaintiff about it and that Plaintiff would receive a warning. Braswell also said to give Plaintiff a warning for not paying court costs, fines, and a supervision fee. (Id. ¶¶ 8–12.)

- Plaintiff alleges that, in February 2018, whenever Braswell came to the facility, she, along with staff members Hinkle, Laskow, and McClain, and the Philadelphia Police Department "plotted to have harm done to [him]." Plaintiff claims that Hinkle, Laskow, and McClain communicated with the police department and another outside party from their private cell phones, and that the police department was providing information on his location and other information from his phone. Braswell also started "building a caseload gearing for a violation," all in an effort to keep him from pursuing his civil suit against the various Defendants. (Id. ¶¶ 15, 17–20.)

B.    **Procedural History**

Plaintiff initiated this action on October 2, 2017 against Defendants Chief Michael Chitwood, Richard Driesbach, Zakia Johnson, and Samantha Siliani, alleging violations of his Fourth, Eighth, and Fourteenth Amendment rights. I originally dismissed Plaintiff's Complaint without prejudice under 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted. In doing so, I gave Plaintiff leave to file an amended complaint and specifically directed that, if he did so, "he must provide the names of all defendants and describe in detail what his claims are, the facts giving rise to those claims, how he was harmed, and by whom." (Mem. & Order, ECF No. 2, Oct. 31, 2017.)

On November 27, 2017, Plaintiff filed an Amended Complaint adding three more Defendants—Deputy Cooper, Pat Crosson, and Rhenae Patterson. On January 9, 2018, Plaintiff filed a Second Amended Complaint naming four new Defendants—Captain Michael Gormley,

Captain Adam Friedman, Captain Anthony Luca, and Director John Cooper—but not naming any of the prior Defendants. Thereafter, on April 9, 2018, I granted Plaintiff leave to file a Third Amended Complaint in which he named as Defendants: Chief of Upper Darby Police Michael Chitwood; employees of the Pennsylvania Department of Corrections Zakia Johnson and Richard Dreisbach; Samantha Siliani and Deputy Lakeisha Cooper of the Board of Probation and Parole; Philadelphia Police Captains Adam Friedman, Michael Gormley, and Anthony Luca; employees of the Self Help Movement John Cooper, Ryan Hinkle, Nick Laskow, and Joe McClain; Pat Crosson;[3] Rhenae Patterson; and Pennsylvania Board of Probation and Parole Supervisor Braswell.

The Third Amended Complaint sets forth a litany of constitutional violations under the Fourth Amendment right to be free from illegal searches and seizures, Fourteenth Amendment right to due process and equal protection, and Eighth Amendment prohibition on cruel and unusual punishment. Now before me are multiple Motions to Dismiss.

---

[3] Defendant named his counselor, Pat Crosson, as a Defendant. Although a summons was issued to Crosson on December 1, 2017, that summons was returned unexecuted on March 27, 2018. Since then, Plaintiff filed the Third Amended Complaint on April 27, 2018, but made no further attempt to serve Crosson with any version of the Complaint. As a result, Crosson is the only named Defendant who has not filed a motion to dismiss.

Under Federal Rule of Civil Procedure 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. 4(m). Accordingly, I will dismiss the claims against Defendant Crosson without prejudice.

## II.    STANDARD OF REVIEW

### A.    Rule 12(b)(1) Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the power of a federal court to hear a claim or a case. Petruska v. Gannon Univ., 462 F.3d 294, 302 (3d Cir. 2006). When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist." Id. at 302 n.3 (quotation omitted).

There are two types of Rule 12(b)(1) motions. A "facial" attack assumes that the allegations of the complaint are true, but contends that the pleadings fail to present an action within the court's jurisdiction. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). A "factual" attack, on the other hand, argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue, causing the case to fall outside the court's jurisdiction. Mortensen, 549 F.2d at 891. In such a case, "no presumptive truthfulness attaches to plaintiff's allegations" and the court must evaluate the merits of the disputed allegations because "the trial court's . . . very power to hear the case" is at issue. Id.

A motion to dismiss pursuant to the Eleventh Amendment—as in the present case—is properly reviewed under Federal Rule of Civil Procedure 12(b)(1). Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 693 n. 2 (3d Cir. 1996). Such a motion is a "facial" challenge. See, e.g., Scott v. Commonwealth Dep't of Public Welfare, No. 02–3799, 2003 WL 22133799, at *2 (E.D. Pa. Aug. 28, 2003); Nelson v. Commonwealth of Pa. Dep't of Public Welfare, 244 F. Supp. 2d 382, 386 (E.D. Pa. 2002). Accordingly, when presented with an Eleventh Amendment challenge, the court "must accept the complaint's allegations as true" and draw all reasonable inferences in favor of the plaintiffs. Scott, 2003 WL 22133799 at *2 (quoting Turicentro, S.A. v. Am. Airlines Inc., 303 F.3d 293, 300 n. 4 (3d Cir. 2002)).

**B.    Rule 12(b)(6) Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and  "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id.

The Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard.  Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014).  First, the court outlines the elements a plaintiff must plead to state a claim for relief.  Id. at 365.  Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth."  Id.  Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" Id., quoting Iqbal, 556 U.S. at 679.  The last step is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id., quoting Iqbal, 556 U.S. at 679.

A prisoner's *pro se* complaint should be "held to less stringent standards than formal pleadings drafted by lawyers." United States ex rel. Walker v. Fayette Cnty., Pa., 599 F.2d 573, 575 (3d Cir. 1979), citing Haines v. Kerner, 404 U.S. 519, 521 (1972). The court must construe the facts stated in the complaint liberally in favor of the plaintiff. Haines, 404 U.S. at 520. "Yet there are limits to our procedural flexibility. For example, *pro se* litigants still must allege sufficient facts in their complaints to support a claim." Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013). Thus, even a *pro se* complaint must conform with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure, which "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" or "naked assertions" that are devoid of "factual enhancement." Iqbal, 556 U.S. at 678 (internal quotations omitted). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' will not do." Id.

## III. DISCUSSION

### A. Motion to Dismiss by Defendant Michael Chitwood, Chief of Upper Darby Police

Defendant Chitwood moves to dismiss all claims against him on the ground that constitutional liability cannot be triggered simply by virtue of his role as a Police Chief. I agree and will grant his Motion.

The Third Amended Complaint sets forth the following facts against Defendant Chitwood:

> 32. In the month of February 2017 [i]s when I started taking furloughs. I took furloughs every week up until 9/27/17. With in [sic] this time frame is when, I started seeing Upper Darby Police trail me. I would see Upper Darby cops as soon as I left my mother[']s house to go to the stores or anywhere else. This is one of the things that let me know they were tracking me. On some occasions I would leave my mother[']s house and leave my phone in the house. I never would see them then. Then I started noticing strange behavior from the stores I frequented from the owners. I was in a store called Luckys on long lane [sic] in Upper Darby PA. I went in the store looking around for items to buy with my back to

> Ms. Lucky while she talked to a female customer. When I looked
> at her she looked frighten [sic]. I brought [sic] my items and left.
> On September 16, 2017 I went back and talked to Ms. Lucky who I
> have known since 2008 and asked if the Police came and told her
> something[.] [S]he said yes, and I informed her when I actually was
> arrested for it and that she does not have to be afraid of me. Under
> the authority of Michael Chitwood[,] several officers from the
> Upper Darby Police tracked my phone on numerous occasions.
> [T]hey also informed several stores I frequented also some of my
> neighbor[s] of my indecent assault and is causing alarm in the
> community.

(Third Am. Compl. ¶ 32.)

The legal claim against Defendant Chitwood states:

> 64.    Defendant Chief Michael Chitwood and officers from the
> Upper Darby Police Department violated my 4th amendment right to
> illegal search [and] seizure by illegally tracking me with some sort
> of device without probable cause or a warrant to do so. In the
> process of doing this[,] he was also informing store owners and
> neighbors about my juvenile conviction. He also violated my 14th
> amendment right by not providing me with equal protection of the
> laws and my rights to due process while acting under color of state
> law.

(Id. ¶ 64.)

Such allegations do not plausibly plead § 1983 liability. The mere fact, without more, that

a defendant holds a supervisory position is insufficient to prove a cause of action because § 1983

does not support civil rights claims based upon a theory of *respondeat superior*. Durmer v.

O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993). Rather, liability under a § 1983 claim against a

state official in his individual capacity must be premised on one of two theories. First, an

individual supervisor may be liable on grounds of personal involvement. See Evancho v. Fisher,

423 F.3d 347, 353 (3d Cir. 2005) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)

("A defendant in a civil rights action must have personal involvement in the alleged wrongs.")).

"Personal involvement can be shown through allegations of personal direction or of actual

knowledge or acquiescence.  Rode, 845 F.2d at 1207; see also C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 201 (3d Cir. 2000) ("It is, of course, well established that a defendant in a civil rights case cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.").  Such allegations "must be made with appropriate particularity," meaning that a plain allegation that a defendant had responsibility for supervising other defendants is insufficient.  Rode, 845 F.2d at 1207.  Alternatively, "individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'"  A.M. ex rel J.M.K. v. Luzerne Cty. Juvenile Detention Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)).

Plaintiff has not set forth any factual allegations to support either theory of liability against Defendant Chitwood.  First, Plaintiff has not plausibly pled any personal involvement by Defendant Chitwood in the alleged wrongs.  The allegations against him constitute conclusory, non-specific assertions that Chitwood—solely due to his position as Chief of the Upper Darby Police Department—knew of and directed the constitutional deprivation.  The Third Amended Complaint contains no facts that Chitwood either personally trailed Plaintiff and spoke to residents in Upper Darby about his juvenile conviction, or specifically directed that his subordinate officers engage in such actions.  To the extent Plaintiff alleges that the tracking of his phone or other movements was done "[u]nder [Chitwood's] authority," such a statement fails to provide any detail as what directions Chitwood actually gave.

Nor can Plaintiff plausibly allege that Defendant Chitwood is a final policymaker for purposes of the second theory of liability.  Indeed, the United States Court of Appeals for the Third Circuit has held that "as a matter of Pennsylvania state law, a township Police Chief is not a final

policymaker." Santiago v. Warminster Twp., 629 F.3d 121, 135 n.11 (3d Cir. 2010); see Boyen v. Township of Upper Darby, 5 F. Supp. 3d 731, 743 (E.D. Pa. 2014) (finding Chitwood to not be a final policymaker under Pennsylvania law).

While Federal Rule of Civil Procedure 8(a) does not require a great deal of specificity, the claim must be pled with "appropriate particularity" and Plaintiff must allege facts sufficient to raise at least a plausible inference that the state official was personally involved in violating his constitutional rights. Evancho, 423 F.3d at 353. As Plaintiff has not met this standard, I will grant Defendant Chitwood's Motion to Dismiss.

**B.** **Motion to Dismiss of Zakia Johnson, Richard Dreisbach, Samantha Siliani, and Lakeisha Cooper**

Defendants Zakia Johnson, Richard Dreisbach, Samantha Siliani, and Lakeisha Cooper (collectively, the "Commonwealth Defendants") also move to dismiss all claims against them in either their official or individual capacities.[4]

1.     Official Capacity Claims

The Commonwealth Defendants posit that the Eleventh Amendment bars Plaintiff's § 1983 claims against them in their official capacities.

The Eleventh Amendment provides that, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. The United States Supreme Court has noted that the Eleventh Amendment presupposes that each state is a sovereign entity in our federal system and that, as a sovereign, it is not amenable to the suit of an individual without its consent. Seminole Tribe of Fl. v. Fl., 517

---

[4]   As it is unclear from the Third Amended Complaint whether the Commonwealth Defendants are being sued in their official or individual capacities, I address both types of claims.

U.S. 44, 54 (1996).  The type of relief sought is irrelevant—the Eleventh Amendment bars an action regardless of whether the plaintiff seeks legal or equitable relief.  Id. at 58.  The Eleventh Amendment also extends immunity to suits for retrospective monetary relief against state officials in their official capacity.  Kentucky v. Graham, 473 U.S. 159, 169–70 (1985).  This is because "a suit against a state official in his or her official capacity is . . . no different from a suit against the State itself."  Will v. Mich. Dept. of State Police, 491 U.S. 58, 71 (1989).

Here, the Third Amended Complaint specifically alleges that Johnson and Dreisbach are employees of the Pennsylvania Department of Corrections, (Third Am. Compl. ¶¶ 6, 33), which is an executive department of the Commonwealth of Pennsylvania.  71 P.S. § 61(a).  Moreover, Siliani and Cooper are alleged to be agents of the Board of Probation and Parole, (Third Am. Compl. ¶¶ 41, 47), which is also an arm of the Commonwealth of Pennsylvania and entitled to Eleventh Amendment immunity.  Haybarger v. Lawrence Cnty. Adult Probation and Parole, 551 F.3d 193, 198 (3d Cir. 2008).  As Eleventh Amendment immunity extends to state officials in their official capacity, I find that Plaintiff's claims against Johnson, Dreisbach, Siliani, and Cooper in their official capacities are barred.

2.   Individual Capacity Claims

The Third Amended Complaint is somewhat ambiguous regarding the nature of the allegations against the Commonwealth Defendants in their individual capacities.  Liberally construing the allegations therein, it appears that Plaintiff sets forth a Due Process Clause claim, an Equal Protection Clause claim, a Fourth Amendment claim for illegal search and seizure, and an Eighth Amendment claim for violating the prohibition against cruel and unusual punishment.

The Fourteenth Amendment of the Constitution forbids a state from depriving persons of life, liberty, or property without due process of law.  U.S. Const. amend XIV, § 1.  When a plaintiff sues under 42 U.S.C. § 1983 for a state actor's failure to provide procedural due process, the court employs the "familiar two-stage analysis," inquiring (1) whether "the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property;'" and (2) whether the procedures available provided the plaintiff with "due process of law."  Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984).

Prisoners and parolees enjoy a more limited range of protected interests than average citizens.  "As a parolee, [an individual] does not enjoy 'the absolute liberty to which every citizen is entitled, but only [a] conditional liberty properly dependent on observance of special parole restrictions.'"  Johnson v. Mondrosch, 586 F. App'x 871, 874 (3d Cir. 2014).  "Restrictions to a particular community, job, or home, as well as restrictions on travel or movement, are standard conditions of parole."  Id.

Plaintiff here alleges that (1) Defendant Johnson violated the Due Process Clause by moving Plaintiff to different facilities to inconvenience him and manipulating the grievance process; (2) Defendants Siliani and Deputy Cooper violated the Due Process Clause by sabotaging his employment and his home plans; and (3) Defendant Driesbach failed to correct the misconduct of Johnson and encouraged the continuation of the misconduct.  None of these claims constitute a due process violation.

As to Plaintiff's claim that Johnson moved him to different facilities, it is well established that "prisoners have no liberty interest arising from the Due Process Clause in a particular place of confinement."  Thompson v. Pitkins, 514 F. App'x 88, 89 (3d Cir. 2013) (citing Olim v.

Wakinekona, 461 U.S. 238, 245–46 (1983)).  To the contrary, "[a] state has broad authority to confine an inmate in any of its institutions." Chavarriaga v. NJ Dept. of Corrs., 806 F.3d 210, 225 (3d Cir. 2015) (citing Meachum v. Fano, 427 U.S. 215, 224 (2005)).  "Thus, courts recognize that a state's authority to place inmates anywhere within the prison system is among 'a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts.'" Id. (quoting Meachum, 427 U.S. at 225.)  The same holds true for parolees institutionally confined to a halfway house—as Plaintiff was here. Asquith v. Dept. of Corrs., 186 F.3d 407, 411 (3d Cir. 1999); Haley v. Kintock Grp., 587 F. App'x 1, 3 (3d Cir. 2014).  As such, corrections officials do not infringe an inmate's liberty interests by placing him in one particular custodial facility over another. Id.

With respect to Plaintiff's claim that Johnson manipulated the grievance process, such an allegation does not reach the level of a due process violation.  Prisoners and parolees who remain in some type of institutional confinement do not have a constitutional right to prison grievance procedures. Thompson, 514 F. Appx' at 89–90; Fears v. Beard, 532 F. App'x 78, 81 (3d Cir. 2013).  Nor do they have a liberty interest protected by the due process clause in the grievance procedures. Fears, 532 F. App'x at 81.  Indeed, "the Constitution does not guarantee a functioning grievance process because a prisoner or pretrial detainee may file suit in federal court if his grievances are not answered." Tapp v. Proto, 718 F. Supp. 2d 598, 616 (E.D. Pa. 2010), aff'd, 404 F. App'x 563 (3d Cir. 2010).  Plaintiff here alleges that he repeatedly availed himself of the grievance procedure, and actually received responses to several of his grievances.  (Third Am. Compl. ¶¶ 33–35, 37–38, 53.)

As to Siliani and Cooper's alleged sabotage of Plaintiff's home plans and outside employment, "an inmate's mere anticipation of freedom, when a privilege has been granted but

not yet implemented, does not give rise to a constitutionally recognized liberty interest." Powell v. Weiss, 757 F.3d 338, 342 (3d Cir. 2014). A plaintiff "cannot state a claim based on his anticipated release on a home plan." Brayboy v. Johnson, No. 17-4371, 2017 WL 4931680, at *2 (E.D. Pa. Oct. 31, 2017). Other than alleging that Siliani and Cooper—as his parole officers— informed employers and potential employers of his prior convictions, Plaintiff has not identified the manner in which they "sabotaged" his employment.

Finally, as to Driesbach's alleged failure to correct the alleged misconduct and encouraging the continuation of the misconduct, Plaintiff has not alleged any underlying constitutional violation to which Driesbach could have responded. Therefore, Plaintiff cannot plausibly plead a claim of liability against him.

### b. *Equal Protection Claim*

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The Third Circuit has recognized that in order to establish a viable equal protection violation, a plaintiff must show intentional or purposeful discrimination. See Wilson v. Schillinger, 761 F.2d 921, 929 (3d Cir. 1985). The Equal Protection Clause is not a command that all persons be treated alike but, rather, "a direction that all persons similarly situated should be treated alike." Artway v. Attorney Gen. of State of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).

If the action does not involve a suspect classification, the plaintiff may establish an equal protection claim under a "class of one" theory. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). To succeed on such a theory, a plaintiff must show that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was

no rational basis for the difference in treatment." Phillips v. County of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008) (citing Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006)).

In a prison setting,

> [A]n inmate must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination . . . . He must also show that the disparity in treatment cannot survive the appropriate level of scrutiny, which, in a prison setting, means that [a plaintiff] must demonstrate that his treatment was not "reasonably related to [any] legitimate penological interests."

Holland v. Taylor, 604 F. Supp. 2d 692, 701 (D. Del. 2009) (quoting Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) (internal citation, quotation marks, and alterations omitted)). Stated simply, the Equal Protection Clause in a prison setting only requires that a regulation which results in unequal treatment of an inmate bear some rational relationship to a legitimate penological interest. See DeHart v. Horn, 227 F.3d 47, 61 (3d Cir. 2000).

Plaintiff's equal protection claim does not allege discrimination based on membership in a protected class. Rather, he alleges that the Commonwealth Defendants treated him differently than similarly situated prisoners because of his juvenile conviction. Such disparate treatment included moving him to different facilities, subjecting him to strip searches, manipulating the grievance process, and denying his furloughs.

None of these allegations plead plausible grounds for a violation of his equal protection rights. As to the claims of movement to different facilities and strip searches, Plaintiff specifically alleges that Defendant Johnson "moved around 13 inmates to Kalman Hall with me to not single me out, and we all was subject to these searches and we all constantly complained. Whoever was written up remained in Kalman Hall, the rest of the inmates was moved back to CEC Broad on 1/24/17." (Third Am. Compl. ¶ 29.) Plaintiff further contends that he and the other inmates were

returned to CEC Broad in February 2017, where they were subjected to another strip search. (Id. ¶ 30.) Such allegations undermine any contention that Plaintiff was treated differently than similarly situated inmates.

As to Plaintiff's contention that Defendant Johnson showed discrimination by manipulating the grievance process and that Defendant Siliani showed discrimination by not approving his furloughs, Plaintiff has failed to adequately allege that any other similarly-situated inmates without juvenile convictions were treated differently. Moreover, Plaintiff fails to make the basic allegation of either intentional or purposeful discrimination necessary to prove that there was no rational basis to any legitimate penological interest. Even drawing all reasonable inferences from the Third Amended Complaint in Plaintiff's favor, Plaintiff's equal protection claim appears to be nothing more than a mere disagreement with decisions made by correctional and parole staff. Despite the more relaxed scrutiny afforded to *pro se* prisoners, such a claim does not survive Rule 12(b)(6) scrutiny.

c.     *Fourth Amendment Claim*

Plaintiff's Fourth Amendment claim appears to allege that the unreasonable strip searches violated the prohibition against unreasonable searches and seizures. (Third Am. Compl. ¶ 66.) I will dismiss this claim.

"[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities . . . . The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials." Florence v. Bd. of Chosen Freeholders of Cnty of Burlington, 566 U.S. 318, 328 (2012). Under the Supreme Court's balancing test, set forth in Bell v. Wolfish, 441 U.S. 520 (1979), courts must consider "the scope of the particular intrusion, the

manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559. A regulation "impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests." Florence, 566 U.S. at 326 (quotation marks omitted). Thus, "it is constitutional to conduct a full strip search of an individual detained in the general population of a jail, regardless of the reason for detention or the existence of reasonable suspicion that the individual is concealing something." Small v. Wetzel, 528 F. App'x 202, 207 (3d Cir. 2013) (citing Florence, 566 U.S. at 328); see also Smart v. Santiago, No. 15-1065, 2015 WL 22262076, at *2 (D.N.J. May 12, 2015) ("[W]here officials conduct [strip] searches in a reasonable manner to maintain security and to prevent the introduction of contraband or weapons in the facility, strip searches do not violate the Fourth Amendment.").

It is well settled that inmates may be strip searched on entering a prison population or moving from general housing to restricted housing. Florence, 566 U.S. at 326; Small, 528 F. App'x at 207. "When a prisoner moves through restricted areas of a correctional facility, it is not unreasonable for staff to check for contraband via visual body cavity searches upon the prisoner's return." Jones v. Luzerne County Corr. Facility, No. 10-359, 2010 WL 3338835, at *8 (M.D. Pa. Aug. 23, 2010) (citing Millhouse v. Arbasak, 373 F. App'x 135 (3d Cir. 2010)).

Plaintiff provides limited allegations about the strip searches at issue. He asserts that, on January 11, 2017, he, along with approximately twelve other inmates, were moved to high-security facility Kalman Hall for "construction reasons." (Third Am. Compl. ¶¶ 25, 29.) When he returned from a job search pass on January 15, 2017, he was subjected to a strip search. (Id. ¶ 26.) He was subjected to similar searches on January 16, 2017 and January 21, 2017 "for no reason." (Id. ¶ 27.) All of the inmates that had been moved to Kalman Hall were subjected to these searches. (Id.

¶ 29.)  When the inmates returned back to CEC Broad in February 2017, they were strip searched again.  (Id. ¶ 30.)

Such allegations do not allow any plausible inference that the strip searches violated the Fourth Amendment.  Indeed, the Third Amended Complaint suggests that the searches were related to a legitimate penological interest.  Plaintiff was strip searched four times during a three-week period, all of which coincided with his transfer to Kalman Hall, his return from a job search pass, and his return to CEC Broad.  Plaintiff concedes that he was never strip searched prior to going to Kalman Hall, and does not allege the continuation of these strip searches after he returned to CEC Broad.  Nor does Plaintiff suggest that these searches were done in the presence of any other inmates or in an unreasonable manner.[5]  Aside from Plaintiff's speculative inference that the searches were used to get inmates to object and receive disciplinary write-ups, the facts as pled suggest that the searches were reasonably conducted to ensure safety and security during the course of Plaintiff's movement between detention facilities.  Taking the allegations of the Third Amended Complaint as true, I find that Plaintiff has not plausibly pled a Fourth Amendment violation.

### d.  Eighth Amendment Claim

Finally, Plaintiff brings an Eighth Amendment claim (a) against Defendant Johnson for allowing continued strip searches and moving him to different facilities, and (b) against Defendant Driesbach for allowing such violations to occur.

---

[5]  Plaintiff states that on January 15, 2017, he was stripped "completely naked and had to spread my butt in front of [the officers] for no reason."  (Third Am. Compl. ¶26.)  The Supreme Court has held that a prison's policy of strip and visual body cavity searches, requiring inmates to stand naked, lift their genitals and bend over and spread their buttocks for visual inspection, did not violate an inmate's Fourth Amendment rights.  Bell, 441 U.S. at 558–59; see also Brown v. Blaine, 185 F. App'x 166, 169–70 (3d Cir. 2006) (finding no constitutional violation where inmate was required to lift his penis and testicles, spread his buttocks and then place his hands on his head and sweep his mouth with his fingers).

"The Eighth Amendment, in only three words, imposes the constitutional limitation upon punishments: they cannot be 'cruel and unusual.'" Rhodes v. Chapman, 452 U.S. 337, 345 (1981). Prison officials have a duty under the Eighth Amendment to "provide humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832 (1994). Thus, to prevail on a "conditions of confinement" claim, an inmate must show that the deprivation is "objectively sufficiently serious" and that the prison official subjectively acted with deliberate indifference to inmate health or safety. Id. at 834. Deliberate indifference is something more than mere negligence, but something less than acts or omissions purposely designed to cause harm. Id. at 835; Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

Plaintiff's claim that his transfers constituted cruel and unusual punishment fails for the same reason as the due process claim. "[A]n inmate has no constitutional right to any particular custody classification." Quijada v. Bledso, No. 08-2022, 2011 WL 1303224, at *9 (M.D. Pa. Mar. 31, 2011). "A transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." Id. Plaintiff has not alleged any of the conditions in Kalman Hall rose to the level of cruel and unusual punishment.

Plaintiff's claim that the strip searches violated the Eighth Amendment also cannot survive Rule 12(b)(6) review. To set forth an Eighth Amendment claim resulting from a strip search, a plaintiff must allege that the search was conducted in a physically abusive manner. Williamson v. Garman, No. 15-1797, 2017 WL 2702539, at *4 (M.D. Pa. June 22, 2017). Body cavity ssearches "even if embarrassing and humiliating, do not violate the constitution." Millhouse, 373 F. Appx. at 137. Plaintiff puts forth no allegations that any force was used or that he was harmed in any manner during the searches. Accordingly, this claim must fail.

*e.* *Conclusion as to Commonwealth Defendants' Motion*

For the foregoing reasons, I find that Plaintiff fails to set forth any constitutionally cognizable claim against Defendants Johnson, Siliani, Lakeisha Cooper, or Driesbach. Accordingly, I will grant their Motion to Dismiss.

**C.** **Motion to Dismiss by Defendants Friedman, Gormley, and Luca**

Defendants Friedman, Gormley, and Luca (collectively, "the Philadelphia Police Captains") next move to dismiss any claims against them as they are not named at all in the body of the Third Amended Complaint.

As set forth above, the mere fact that a defendant holds a supervisory position is insufficient to prove a cause of action because § 1983 does not support civil rights claims based upon a theory of *respondeat superior*. Durmer v. O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993). Rather, a plaintiff must either allege that the defendant was personally involved in the constitutional violation or set forth factual allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

Here, the Third Amended Complaint does not mention any of the Philadelphia Police Captains. As such, it is devoid of any suggestion that they were personally involved in any constitutional violations. Even assuming Plaintiff was given leave to amend his Complaint and include his argument—set forth in his response to the Motion to Dismiss—that the Philadelphia Police Captains gave orders to officers to trail and surveil him through his cell phone, such an allegation is nothing more than a bald legal assertion that is not entitled to any deference on Rule 12(b)(6) review. Accordingly, I will grant this Motion to Dismiss.

**D.** **Motion to Dismiss by Defendants Hinkle, Laskow, McClain, and John Cooper**

The Third Amended Complaint also sets forth claims against Defendants Hinkle, Laskow, McClain, and Director John Cooper all of whom are employees of the Self Help Movement.

Specifically, Plaintiff speculates that there must have been a meeting between Director Cooper and staff at the Self Help Movement about pornography on Plaintiff's phone, and Cooper began telling other inmates at the facility about it to provoke harm to him. (Third Am. Compl., 1st Supp., ¶ 5.) Plaintiff further alleges that he is "currently being targeted by the Self Help Movement staff[,] they have been sneaking in my room from January 2nd 2018 to January 8th 2018 between the hours of 3:00 p.m. to 10:00 p.m. [to] look through my legal documents just searching while I'm not there." (Id. ¶ 13.) He goes on to state that, in February 2018, he noticed Hinkle, Laskow, and McClain talking with Parole Supervisor Braswell. (Third Am. Compl., 2nd Supp. ¶ 4.) He came to the conclusion that Braswell, Cooper, Hinkle, Laskow, and McClain "plotted" with the Philadelphia Police Department to have harm done to Plaintiff and that he "believe[s] that staff members Nick [Laskow], Hinkle, [and] Joe [McClain] communicated with someone from the Police Department and another outside party from th[eir] private cell phones." (Id. ¶¶ 15, 17.) Based on these allegations, Plaintiff contends that Cooper, Hinkle, McClain, and Laskow "showed discrimination which violates my 14th amendment right to equal protection." Moreover, Plaintiff alleges that Cooper violated his Fourth Amendment right against illegal search and seizure.

These claims cannot survive Rule 12(b)(6) scrutiny. It is well established that, to recover under 42 U.S.C. § 1983, a plaintiff must establish that defendants (a) "acted under color of state law" to (b) deprive the plaintiff of a right secured by the Constitution." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (quotations omitted). Plaintiff satisfies neither element.

Under the first element, the plaintiff must allege facts demonstrating that the misconduct was done under color of state law. Sprauve v. W. Indian Co. Ltd., 799 F.3d 226, 229 (3d Cir. 2016). "[M]erely private conduct, no matter how discriminatory or wrongful" does not fall within the scope of § 1983. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999) (quotations

omitted)). Plaintiff does not allege that Cooper, Hinkle, McClain, or Laskow were state actors. Indeed, the Third Amended Complaint alleges that they are employees of the Self Help Movement, which is a private drug and alcohol treatment agency in Philadelphia.

Moreover, Plaintiff does not allege that he has been deprived of any right secured by the Constitution. For his equal protection claim, a plaintiff must show that he was intentionally treated differently from other similarly situated individuals without a rational basis for difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Plaintiff's claims against these Defendants, set forth nothing other than conclusory and speculative allegations that they, in some unspecified manner, conspired with the Parole Board Supervisor and the Philadelphia Police Department to inflict some unknown type of harm against Plaintiff. Based on these assertions, I can draw no reasonable inference that Defendants Hinkle, McClain, and Laskow committed any actions that violated Plaintiff's constitutional right to equal protection.

Plaintiff's Fourth Amendment cause of action against Cooper also does not set forth any cognizable constitutional claim for unreasonable search and seizure. The sole possible allegation related to this claim asserts that staff of the Self Help Movement have been "sneaking in [his] room from Jan 2nd 2018 to Jan 8th 2018 between the hours of 3:00 pm to 10:00 pm [to] look through his legal documents." (Third Am. Compl., 1st Supp. ¶ 5.) Plaintiff, however, has not alleged any legitimate expectation of privacy in his room at whatever residential facility he was placed. See United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005) (recognizing that a parolee's expectation of privacy is less than the average citizen's). Moreover, Plaintiff sets forth no facts from which I can infer that Cooper personally participated in any search or otherwise directed that such a search occur.

Therefore, these claims will be dismissed.[6]

### E.     **Motion to Dismiss by Defendant Braswell**

In the Third Amended Complaint, Plaintiff brings an equal protection claim against Parole Supervisor Braswell for treating him differently than other inmates. Plaintiff's claims against Braswell are similar to those against the Self Help Movement employees, *i.e.*, that Braswell, along with Hinkle, Laskow, McClain, and the Philadelphia Police Department were plotting to have harm done to him and to prevent him from pursuing his federal lawsuit. (Third Am. Compl., 2nd Supp. ¶¶ 15, 19–20.) Plaintiff also surmises that Braswell imposed on him a frivolous sanction for not paying court costs, fines, and his supervision fee in an effort to carry out her plans. (Id. ¶¶ 11–12.)

To the extent Plaintiff brings this claim against Supervisor Braswell in her official capacity, it is barred by the Eleventh Amendment for the reasons discussed in section III.B.1 above. See Kentucky v. Graham, 473 U.S. 159, 169–70 (1985) (holding that the Eleventh Amendment extends immunity to suits for retrospective monetary relief against state officials in their official capacity).

To the extent Plaintiff brings this claim against Supervisor Braswell in her individual capacity, he fails to state a claim upon which relief may be granted. There are no allegations of any actions by Braswell that rise to the level of a constitutional violation. Even taking all allegations in the Third Amended Complaint in the light most favorable to Plaintiff, Plaintiff has put nothing more than "unadorned, the-defendant-unlawfully-harmed-me accusations" and "naked assertions" that are devoid of "factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted). Such allegations do not give rise to a plausible constitutional claim.

---

[6]   Plaintiff also alleges that these Defendants "broke state laws to commit bodily harm." (Id. ¶¶ 23–25.) Plaintiff, however, neither alleges that these Defendants harmed him in any manner nor identifies the applicable state laws that were broken.

**F.** **Motion to Dismiss by Defendant Rhenae Patterson**

The last pending motion is brought by Defendant Rhenae Patterson. The Third Amended

Complaint sets forth the following allegations against Patterson:

- On the second day after his arrival at CEC Broad Street, Plaintiff had an orientation with his counselor Rhenae Patterson. During that orientation, Patterson made a joke about oral sex pertaining to his indecent assault. (Third Am. Compl. ¶ 12.)

- Beginning in December 2016, Plaintiff had additional problems with Patterson. She would not put in Plaintiff's work passes and would tell him that he had to return to the facility by 7:00 p.m., when in fact she submitted his return time in the computer as 6:00 p.m., thus subjecting him to potential disciplinary action. (Id. ¶ 13.)

- In January 2017, Plaintiff was in the process of finding a room so he could submit a home plan. He found an ad in the paper and talked to the property owner while at work. Plaintiff returned to the facility after work and provided Patterson with the phone number and address so she could verify where he was going. He then called the property owner, who stated that Patterson called him and that the room would not work out because of the charges on Plaintiff's record. (Id. ¶ 14.)

- All Staffing Warehouse, a forklift company, had guaranteed Plaintiff a job after release, but he had to get permission from Siliani to go to this company because it was outside the county. (Id. ¶ 42.) Plaintiff provided his counselor, Ms. Patterson, with his work pass. The next day, Plaintiff called All Staffing Warehouse to find out who his contact was on the site, but they told him there was no longer a job for him. (Id. ¶ 42.) Plaintiff alleges that Agent Siliani, Patterson, and Johnson all conspired to sabotage his employment and his reentry back into society. (Id. ¶ 43.) Plaintiff further claims that Siliani and Patterson were in constant contact with JQ Staffing, from whom Plaintiff received jobs, to sabotage any employment he may receive. (Id. ¶ 44.)

Based on these allegations, Plaintiff contends that "Patterson, while acting under color of state

law, violated [his] fourteenth amendment by showing discrimination against [him] for [his]

juvenile conviction and also assisting agent [Siliani] in sabotaging [his] employment and

homeplans." (Id. ¶ 72.) Liberally construing these allegations in the light most favorable to

Plaintiff, the Third Amended Complaint appears to assert that Defendant Patterson (1) violated

27

Plaintiff's Equal Protection Clause rights and (2) engaged in a conspiracy to deprive Plaintiff of employment and a home plan.

       1.     Equal Protection Claim

As set forth above, to allege an equal protection claim under a class-of-one theory, a plaintiff must show that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Phillips v. County of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008) (citing Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006)). In a prison setting, an inmate must also demonstrate "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination" and "that his treatment was not 'reasonably related to [any] legitimate penological interests.'" Holland v. Taylor, 604 F. Supp. 2d 692, 701 (D. Del. 2009) (quotation omitted).

Here, none of the allegations against Defendant Patterson rise to the level of an equal protection violation. First, with respect to Patterson's alleged joke about oral sex pertaining to Plaintiff's indecent assault, Plaintiff has set forth no explanation as to how this joke—while perhaps offensive—deprived him of any constitutional right or otherwise constituted a violation of his equal protection rights. Second, as to Patterson's entry of incorrect times for return from work passes or failure to enter in work passes, Plaintiff has neither alleged that he was treated differently than others similarly situated nor suggested that this treatment was not reasonably related to legitimate penological interests. Finally, Patterson's alleged disclosure of Plaintiff's juvenile conviction to his employers does not, on its face, affect any liberty interest outweighing legitimate penological interests. Nor does Plaintiff suggest that similarly situated inmates were treated differently.

In short, Plaintiff's conclusory allegations that Patterson violated his constitutional rights fail to state a plausible claim for relief under § 1983.

        2.     <u>Conspiracy Claims</u>

In order to establish a claim for conspiracy under section 1985(3), a plaintiff must show the following elements:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

<u>Farber v. City of Paterson</u>, 440 F.3d 131, 134 (3d Cir. 2006). A conspiracy—an agreement to commit an unlawful act—is a necessary element of a claim under section 1985. <u>Suber v. Guinta</u>, 902 F. Supp. 2d 591, 608 (E.D. Pa. 2012). "An allegation of conspiracy is insufficient to sustain a cause of action under [section 1985]; it is not enough to use the term 'conspiracy' without setting forth supporting facts that tend to show an unlawful agreement." <u>Gordon v. Lowell</u>, 95 F. Supp. 2d 264, 270 (E.D. Pa. 2000). In addition, because section 1985(3) requires "the intent to deprive of equal protection, or equal privileges and immunities," a claimant must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" in order to state a claim. <u>Farber</u>, 440 F.3d at 135 (quoting <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 102 (2006)).

Plaintiff alleges that Patterson assisted Agent Siliani in sabotaging his employment and home plans. To the extent this allegation is intended to raise a civil conspiracy cause of action, he fails to state a plausible claim for relief. By not identifying any underlying constitutional violation, Plaintiff cannot allege that the agreement was unlawful. Moreover, Plaintiff has not alleged any

racial or otherwise class-based, invidiously discriminatory animus for the conspiracy. Therefore, I must dismiss this claim for failure to state a claim.

## IV.     MOTION FOR LEAVE TO AMEND

Plaintiff has filed two Motions for Leave to Amend, both of which seek to add additional claims against Supervisor Braswell, but neither of which seek to cure any of the above deficiencies.

In civil rights cases, *pro se* plaintiffs often should be afforded an opportunity to amend a complaint before the complaint is dismissed in its entirety. Alston v. Parker, 363 F3d 229, 235–36 (3d Cir. 2004). Nonetheless, the Federal Rules of Civil Procedure do not permit a party, *pro se* or not, to repeatedly file futile pleadings. See Mason v. Peirce, 559 F. App'x 117, 119 (3d Cir. 2014). A district court need not permit a curative amendment if such an amendment would be inequitable or futile, or there has been some showing of bad faith, undue delay, or prejudice. Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004).

Here, Plaintiff is on his fourth iteration of the Complaint. He filed his initial Complaint on October 2, 2017, and I dismissed it under 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted. In granting leave to file an amended complaint, I specifically directed that plaintiff must "provide the names of all defendants and describe in detail what his claims are, the facts giving rise to those claims, how he was harmed, and by whom." (Mem. & Order, ECF No. 2, Oct. 31, 2017.) Plaintiff then filed an Amended Complaint, on November 27, 2017, with three more Defendants. Before any responsive pleading was filed, Plaintiff filed a Second Amended Complaint on January 9, 2018, naming four new Defendants. Several of the Defendants filed Motions to Dismiss, but in lieu of responding, Plaintiff filed two Motions for Leave to File an Amended Complaint, on March 15, 2018 and April 5, 2018. I granted leave and directed Plaintiff to file "one, new comprehensive Amended Complaint that includes all causes of action

and all Defendants that he wishes to pursue in this action." (Order, ECF No. 25, Apr. 9, 2018.) Thereafter, on April 17, 2018, Plaintiff filed his Third Amended Complaint.

Based on this history, I find that further amendment of the Complaint would be both futile and inequitable. As set forth in detail above, none of the extensive facts set forth in the Third Amended Complaint plead a plausible cause of action against any of the Defendants. Moreover, Plaintiff provides no reasonable indication that, if given yet another opportunity to defend, he could cure the severe deficiencies and plead a plausible federal claim. See Tillio v. Spiess, 441 F. App'x 109, 110 (3d Cir. 2011) (finding no abuse of discretion in district court's *sua sponte* dismissal of *pro se* complaint without giving leave to amend where no submission revealed any factual or legal basis for a federal claim).

Moreover, this case has been pending for almost a year while Plaintiff has repeatedly amended his Complaint. Several of the Defendants have had to duplicate their motions to dismiss in light of these amendments. Allowing Plaintiff to file a fifth version of his Complaint, to which Defendants would have to file new motions of dismiss, would be inequitable.

## V.    CONCLUSION

In light of the foregoing, I find that Plaintiff has failed to state a claim upon which relief may be granted against any Defendant. As leave to amend and file a fourth amended complaint would be both futile and inequitable, I will dismiss Plaintiff's claims with prejudice. An appropriate Order follows.